# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                    CRIM CASE NO. 19-20254
    v.                                HON. TERRENCE G. BERG

LINDA WARDLOW,

        Defendant.

_____/

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

Linda Wardlow is one of an extraordinarily small number of Social Security Administration (SSA) fraud defendants who have been sentenced to jail time in this District; on January 16, 2020, this Court sentenced her to six months in custody in light of the sheer egregiousness of her conduct. Wardlow's report date was adjourned once by unopposed motion and twice by stipulation and order, and the Government would have been willing to agree to an additional adjournment in light of the advent of the Covid-19 vaccine. Instead, Wardlow voluntarily reported to the Federal Medical Center (FMC) in

1

Lexington, Kentucky to begin serving her sentence on January 2, 2021. Three days later, on January 5, 2021, she filed a request for compassionate release with the Bureau of Prisons (BOP). Wardlow now moves this Court for compassionate release under 18 U.S.C. § 3582(c)(1)(A), citing a number of positive Covid-19 cases at her facility and asserting that her age and underlying medical conditions heighten her risk of developing serious complications should she contract Covid-19. (ECF No. 18.) Wardlow's motion should be denied.

Wardlow does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Wardlow's heightened risk of severe complications from Covid-19 based on her underlying lung disease qualifies as an "extraordinary" reason for release. But her circumstances are less than compelling in that her medical records indicate that her lung disease is controlled through medication, there are currently few positive Covid-19 cases at FMC Lexington, and she has received her first dose of the Moderna vaccine. Additionally, the

2

§ 3553(a) factors – which the Court must also consider under

§ 3582(c)(1)(A) – do not support release, particularly with regard to

promoting respect for the law.

The Bureau of Prisons has also taken significant steps to protect

all inmates, including Wardlow, from Covid-19. Since January 2020, the

Bureau of Prisons has implemented "a phased approach nationwide,"

implementing an increasingly strict protocol to minimize the virus's

spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th

Cir. 2020). The Bureau of Prisons has also received 75,395 doses of the

Covid-19 vaccine as of March 15, 2021, and is distributing the vaccine to

its staff and inmates as quickly as it is received by each institution. *See*

[CDC Covid-19 Vaccine Tracker](#) and [BOP COVID-19 Vaccination](#)

[Implementation.](#) The Bureau of Prisons also continues to assess its

entire population to determine which inmates face the most risk from

Covid-19, pose the least danger to public safety, and can safely be

granted home confinement. As of March 7, 2021, this process has

already resulted in the BOP releasing at least 138 inmates who were

sentenced in the Eastern District of Michigan. Given the Bureau of

Prisons' efforts, and the lack of a "compelling" justification in this

matter, the Court should deny Wardlow's motion for compassionate release.

## Background

Beginning in early 1994 and continuing for nearly two-and-a-half decades, Linda Wardlow stole nearly $300,000 in SSA benefits intended for her deceased child. Wardlow served as the Representative Payee for her son's benefits, a role that gave her a legal obligation to account for the funds and to report if her son passed away. Despite this role, Wardlow failed to notify the SSA of her son's death – an event which actually occurred *prior* to the SSA even approving her son's claim for benefits. Wardlow then spent nearly 25 years of monthly benefits on herself, despite a legal obligation to use the funds solely for the intended beneficiary. Wardlow perpetuated this fraudulent scheme by submitting upwards of 20 separate written and sworn false accounting forms to the SSA (over the course of at least a decade), all intended to prolong the fraud by convincing the SSA that her son was still alive. And when agents from the SSA Office of the Inspector General suspected fraud, Wardlow continued to try to conceal her crime by

advising the government that her son was receiving experimental treatment in Quito, Ecuador.

On April 23, 2019, Wardlow was charged in a five-count indictment, alleging three counts of mail fraud, one count of theft of government funds, and one count of SSA Representative Payee Fraud. She pleaded guilty to the full indictment, without the benefit of a Rule 11 plea agreement, on August 15, 2019.  On January 16, 2020, she received a below-guidelines sentence of six months in custody.

Following three adjournments of her report date, Wardlow began serving her prison sentence on January 2, 2021, and is currently incarcerated at FMC Lexington; her projected release date is July 2, 2021. Wardlow is seventy years old, and her only underlying medical conditions are emphysema, high blood pressure, and osteoarthritis. Nevertheless, Wardlow has moved for compassionate release, citing her medical conditions and the Covid-19 pandemic. Specifically, she seeks a reduction of her term of six months imprisonment to time served or home confinement. (ECF No. 18, PageID.107, ¶ 26.)

Because Wardlow filed her motion more than 30 days after she made her request for compassionate release to the BOP, she has

exhausted her administrative remedies. But Wardlow should not be granted compassionate release, for the reasons that follow.

## Argument

### I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates, instituting the administration of the vaccine at its facilities, and increasing home confinement.

#### A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

At the outset of the pandemic, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within

6

and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* [BOP Modified Operations](). But to ensure that relationships and communication are maintained throughout this disruption, the Bureau

of Prisons has increased inmates' telephone allowance to 500 minutes

per month, and legal visits are accommodated upon request. *See* [BOP](#)

[Modified Operations](#).

Like all other institutions, penal and otherwise, the Bureau of

Prisons has not been able to eliminate the risks from Covid-19

completely, despite its best efforts. But the Bureau of Prisons' measures

will help federal inmates remain protected from Covid-19 and ensure

that they receive any required medical care during these difficult times.

**B.** **The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by

increasing the placement of federal prisoners in home confinement.

Recent legislation now temporarily permits the Bureau of Prisons to

"lengthen the maximum amount of time for which [it] is authorized to

place a prisoner in home confinement" during the Covid-19 pandemic.

Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).

The Attorney General has also issued two directives, ordering the

Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 7,562 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 22,786. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

The Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his

9

proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

**C.     The Bureau of Prisons is receiving the Covid-19 vaccine and is in the process of administrating the vaccine in its facilities.**

As of March 15, 2021, the Bureau of Prisons has acquired 75,395 doses of the Covid-19 vaccine and has administered 79,657 doses to staff and inmates.[1] *See* CDC Covid-19 Vaccine Tracker and BOP COVID-19 Vaccination Implementation. And at FMC Lexington, the facility at which Wardlow is incarcerated, 270 staff and 127 inmates have been fully inoculated as of the date of this filing. In fact, BOP medical records indicate that Wardlow received her first dose of the Moderna vaccine on February 19, 2021. (Ex. 1, p. 71.) Her second dose should be administered approximately twenty-eight days later, on or around March 19. *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (last visited Mar. 14, 2021).

---

[1] The total doses administered by the BOP is greater than the total doses distributed because vials of the Pfizer-BioNTech COVID-19 vaccine officially contain at least 5 doses but typically contain 6 doses. Use of this sixth dose, if present, is authorized by the FDA. *See* BOP COVID-19 Vaccination Implementation.

## II.   The Court should deny Wardlow's motion for compassionate release.

Wardlow's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir.

12

2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). Those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate

assessment as to whether those factors justify a sentence reduction" when a defendant requests compassionate release. *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021).

### A. Wardlow has not shown "extraordinary and compelling reasons" for compassionate release.

Resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Elias*, 984 F.3d 516, 518 (6th Cir. 2021); 18 U.S.C. § 3582(c)(1)(A). In *Elias*, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. 984 F.3d at 519. The government disagrees with that holding and preserves for further review its argument that § 1B1.13 remains binding. But, given the Sixth Circuit's holding in *Elias*, controlling circuit precedent now forecloses that argument before this Court.

Even so, Wardlow has not satisfied the statutory requirement of showing that "extraordinary and compelling reasons" warrant a

sentence reduction. That statutory requirement means that a defendant's reasons for release must satisfy two strict criteria. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's reasons must be "extraordinary" – meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). The reasons must also be "compelling" – meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Wardlow has not done so.

First, the government agrees that Wardlow's circumstances qualify as "extraordinary." Wardlow's medical records establish that she has emphysema – a form of chronic obstructive pulmonary disease (COPD), which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. Wardlow also has high blood pressure, which *might* place her at an increased risk, according to the CDC. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with emphysema,

Wardlow has an "extraordinary" reason for release under § 3582(c)(1)(A).

Second, however, Wardlow's reasons for release are not "compelling." In the pretrial-release context, the Sixth Circuit has already addressed what qualifies as a "compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns"; (3) the extent to which the proposed release plan would "mitigate or exacerbate" his risk from Covid-19; and (4) the risk from Covid-19 that his release would pose to others. *McGowan*, 2020 WL 3867515, at *2. In *Bothra*, for instance, the defendant was in his 70s and "had health issues rendering him more vulnerable to contracting [Covid-19]." 2020 WL 2611545, at *2. But he was a flight risk, had orchestrated a large and complex fraud scheme, and was detained at a facility that had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his circumstances did not present a "compelling" reason for release. *Id.*

Wardlow's circumstances are even less compelling. The "original grounds" for Wardlow's incarceration here were the egregiousness of her offense conduct – stealing almost $300,000 from the government by concealing her son's death from the SSA for nearly 25 years, doing so while serving in a position of trust with respect to the benefits she was receiving, and submitting numerous false declarations to the SSA in the process. Wardlow's conduct convinced this Court that she required a sentence of 6 months in prison (itself well below the guideline range of 21-27 months in custody). And unlike the pretrial defendant in *Bothra*, Wardlow was *convicted* of her offense here – not just accused of it. So the justice system's "essential" interest in finality weighs far stronger against Wardlow's release than it did the defendant's release in *Bothra*. *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Additionally, Wardlow's medical records reflect that her emphysema is controlled through medication. In Wardlow's request for compassionate release to the BOP, she describes symptoms of difficulty breathing and shortness of breath. She states that she cannot lie down and breathe without fighting for air, and that when she is able to sleep,

17

she wakes up fighting for air, her mouth is completely dry, and she experiences pain in her throat and chest area. (Ex. 2.)

Wardlow is incarcerated at a federal medical center, which is better equipped than other correctional facilities to manage Wardlow's medical conditions. Since reporting to FMC Lexington, Wardlow has been consistently treated and counseled regarding her emphysema, and her BOP medical records do not reflect the severity of symptoms reported by Wardlow above. For example, at her intake examination on January 5, 2021, Wardlow's lungs were clear without evidence of wheezes, crackles, rhonchi, or rales. On February 2, 2021, Wardlow denied any pain or significant cough related to her emphysema, and on exam, her lungs were clear and within normal limits. The medical provider noted that Wardlow's symptoms were controlled with albuterol, of which she did not require heavy or frequent usage. And on February 3 and 26, 2021, Wardlow's pulmonary exams were within normal limits, she did not have any respiratory distress, and she denied any shortness of breath. (Ex. 1, pp. 8, 14-15, 17-20, 50.) Indeed, Wardlow's own pulmonologist indicated that the "emphysematous changes on imaging of her chest . . . [are] managed with inhaler

therapy." (Ex. 1, p. 113.) Thus, when assessing Wardlow's request for compassionate release based on her emphysema, the Court should consider its well-controlled nature with medication.

As an additional basis for relief, Wardlow cites the 300 active Covid-19 cases among inmates and staff at FMC Lexington on December 31, 2020, a few days before her report date. Since then, as Wardlow points out, the number of active cases at FMC Lexington has diminished significantly, to 8 inmates and 4 staff members on February 28, 2021. (ECF No. 18, PageID.106-07, ¶¶ 20-21.) And as of today, FMC Lexington is reporting even fewer active cases – 5 inmates and 4 staff members – which amounts to only 0.4% of the total inmates at the facility. As FMC Lexington proceeds to vaccinate inmates and staff, the likelihood of an outbreak similar to the numbers reported on December 31, 2020, is greatly reduced.

In fact, and perhaps most importantly, Wardlow's BOP medical records indicate that she received the first dose of the Moderna Covid-19 vaccine on February 19, 2021. (Ex. 1, p. 71.) By the time the Court reads the Government's brief, it is likely that Wardlow will be receiving her second and final dose within the week. According to the CDC,

clinical trials have shown that the Moderna vaccine is 94.1% effective at preventing Covid-19 illness in people who have received two doses and is highly effective among persons with underlying medical conditions. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (last visited Mar. 14, 2021). Therefore, Wardlow is much less likely to be infected with Covid-19 or suffer from severe symptoms and complications if infected.

Wardlow's receipt of the vaccine essentially eliminates any extraordinary and compelling reason that Wardlow might have for compassionate release. Many courts, including two in this District, have reached a similar conclusion. *See United States v. McQuarrie*, No. 16-20499-1, 2021 WL 843177, at *5 (E.D. Mich. Mar. 5, 2021) (Ludington, J.) (where defendant received first dose of vaccine, "Court will not deem an underlying susceptibility to COVID-19 'extraordinary and compelling' where the movant is vaccinated against the disease and is not housed in a facility with a substantial outbreak"); *United States v. Smith*, No. 17-CR-20753, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.) ("Defendant's vaccination [two doses of the Moderna vaccine] against COVID-19 precludes the argument that his

susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)."); *United States v. Goston*, No. 15-20694, 2021 WL 872215, at *2 (E.D. Mich. Mar. 9, 2021) (Levy, J.) (defendant's "access to the COVID-19 vaccine mitigates any extraordinary and compelling reasons that might otherwise justify release."); *United States v. Cortez*, No. CR-18-00858-01-PHX-SPL, 2021 WL 689923, at *1 (D. Ariz. Feb. 23, 2021) (relief denied because inmate received both doses of the Pfizer vaccine); *United States v. Grummer*, No. 08-CR-4402-DMS, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (relief denied to inmate who received both doses of Pfizer vaccine; "Although Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19."); *United States v. Beltran*, No. 6:16-4(SSSS)-4, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (relief denied in light of administration of first dose of the Pfizer vaccine).

Under these circumstances, Wardlow cannot show an extraordinary or compelling reason for compassionate release, and her motion should be denied.

## B.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," she is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188-89 (6th Cir. 2020) (same).

This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction." *Sherwood*, 986 F.3d at 954. The defendant must therefore "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Id.* Here, even if the Court were

to find that Wardlow established extraordinary and compelling reasons for her release, the § 3553(a) factors should still disqualify her.

Over roughly a 25-year period, Wardlow stole over $292,000 in government benefits. She regularly and repeatedly submitted written, sworn, false accounting forms to the government – at least 20 separate forms over a span of at least 10 years. These false submissions were made in her own name, while acting as Representative Payee for her son's benefits, with the goal of convincing the SSA that her son was still alive and entitled to benefits. Month after month, *decade after decade*, Wardlow continued to accept money from the SSA and represent to the SSA that she was spending the money on behalf of her son, all while concealing the fact that her son had passed away. Wardlow's theft – and her egregious attempts at concealment – continued through 2018, when she was 68 years old.

The egregiousness of Wardlow's offense conduct convinced this Court that Wardlow deserved a below-guidelines sentence of 6 months in prison. In what appears to be an attempt to serve as little of this sentence as possible, Wardlow, with full knowledge of her own health conditions and the pandemic, and despite the advent of the vaccine and

23

the Government's previous amenability to deferring her report date, voluntarily reported to custody and *immediately* began the process for a sentence reduction, based on her health conditions and the pandemic. While she has served approximately 40 percent of her sentence at this juncture, and her risk of recidivism and danger to the public are low, a sentence reduction under these circumstances would not promote respect for the law. Put simply, if a 68-year-old with multiple comorbidities believes it acceptable to commit this crime, a 70-year-old with those same comorbidities who is almost fully vaccinated against Covid-19 can, and should, be required to serve the entirety of her sentence.

### C. The Court should decline Wardlow's alternative request for a recommendation that she be granted home confinement.

To the extent that Wardlow makes an alternative request for a judicial recommendation to the Bureau of Prisons that she finish her sentence under home confinement, and even assuming the Court has the authority to grant such a recommendation, Wardlow's request should be denied for the reasons stated above, namely that Wardlow will be soon be fully vaccinated against Covid-19.

**III.   If the Court were to grant Wardlow's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Wardlow's motion despite the Government's arguments above, the Court should order that she be subjected to a 14-day quarantine before release.

## Conclusion

Wardlow's motion should be denied.


Respectfully Submitted,

SAIMA S. MOHSIN
Acting United States Attorney

*s/Corinne M. Lambert*
CORINNE M. LAMBERT
Special Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9129
Corinne.Lambert@usdoj.gov

Date: March 15, 2021

## **Certificate of Service**

I hereby certify that on March 15, 2021, I filed the foregoing electronically via the CM/ECF system, which will send notification of such filing to counsel of record:

Jeffrey L. Edison
500 Griswold Street, Suite 2410
Detroit, MI 48226
(313) 964-0400
jelee@ix.netcom.com

*s/Corinne M. Lambert*
CORINNE M. LAMBERT